**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**M.A.L., a minor child, by and through his parents and**
**next friends, M. L. and S.A.,**

             **Plaintiff,**          **CASE NUMBER: 07-10391**
                                 **HONORABLE VICTORIA A. ROBERTS**

**v.**

**STEPHEN KINSLAND, individually and in his**
**official capacity as Principal of Jefferson Middle School,**
**TIMOTHY FITZPATRICK, in his official capacity**
**as Superintendent of Jefferson School District,**
**ADRIANNE WERNER, individually and in her official**
**capacity as Guidance Counselor at Jefferson Middle**
**School, GARY BOUDRIE, individually and in his official**
**capacity as a Teacher at Jefferson Middle School,**
**JEFFERSON SCHOOL DISTRICT,**

             **Defendants.**
_____/

**OPINION AND ORDER**

**I.    INTRODUCTION**

At issue is the constitutionality of Defendants' Policy concerning the Distribution

of Non-School Sponsored Literature Or Publications ("Distribution Policy" or "Policy").

Michael Amble Lucas ("Plaintiff") asks this Court for declaratory and injunctive relief to

prohibit Defendants, Jefferson School District ("JSD"), Stephen Kinsland, Principal of

Jefferson Middle School ("JMS"), Timothy Fitzpatrick, Superintendent of JSD, Adrianne

Werner, Guidance Counselor at JMS, and Joseph J. Swack, a teacher at JMS, from

violating Plaintiff's First and Fourteenth Amendment rights under the United States

Constitution.

Plaintiff is a 14 year old, eighth grade student who joined a nationwide group of

middle and high school students participating in the "3rd Annual Pro-Life Day of Silent Solidarity" on October 24, 2006 at his school.  Plaintiff seeks to engage in the same type of protest on January 31, 2007.  The protest is organized by the national group "True Stand."  On the designated day, students on campuses across the country express their views against abortion by remaining silent throughout the school day, wearing red armbands, and distributing literature detailing various facts about abortion. The students also wear red tape over their mouths to symbolize that they speak for unborn children.

In October, Defendants prohibited Plaintiff from engaging in several of the activities outlined above.  Since then, the parties stipulated to the following, which will pertain as of January 31, 2007:

1. Plaintiff cannot wear tape on his mouth.

2. Plaintiff may wear red tape on his wrists.

3. Plaintiff may wear a black hooded sweatshirt which says on the front, "Pray to End Abortion."

4. Jefferson School District retains the right to control the conduct if there are material and substantial disruptions or the reasonable forecast of such disruptions.

5. Plaintiff may engage in 1-3 until final judgment is entered by the Court.

6. For purposes of the equitable relief sought, Defendants are not taking the position that the literature Plaintiff seeks to distribute would cause a substantial disruption or a material interference with the normal operation of the school or school activities.

The parties could not reach agreement on whether Plaintiff would be allowed to distribute his anti-abortion literature in the school hallways, which he wishes to do. Although Defendants say they do not object to the content of his literature, Defendants

believe they are entitled to place reasonable restrictions on the time, place, and manner of distribution of the literature. They believe their Distribution Policy is such a reasonable restriction. They offer that Plaintiff can distribute his literature during the lunch hour at a table in the school cafeteria and post fliers in the hallways and on student bulletin boards.

While Plaintiff agrees that the school can place reasonable restrictions on the distribution of non-school sponsored literature, Plaintiff contends that such restrictions are inappropriate without objective evidence of the likelihood that the distribution will cause a material disruption, as that standard is articulated in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). Further, Plaintiff argues that the Distribution Policy is vague, overbroad, and unreasonable. Plaintiff argues that Defendants cannot exercise prior restraint by requiring pre-approval of his literature, and that he should be allowed to distribute in the hallways between classes.

A hearing on Plaintiff's request for injunctive relief was held on Monday, January 29, 2007. Testimony was taken, exhibits were admitted into evidence, and the parties had an opportunity to fully brief the issues presented.

For the reasons set forth below, the Court finds that Plaintiff has demonstrated that he will likely prevail on the merits, inasmuch as there were no proofs that distribution of his anti-abortion literature disrupted school operations in the past or that it would disrupt on January 31, 2007. Further, the Distribution Policy is overbroad. The Court also finds that Plaintiff would likely suffer irreparable harm if an injunction does not issue; that issuance of an injunction will not substantially harm others; and, it is in the public interest for this Court to issue an injunction.

3

## II.    FACTUAL BACKGROUND

### A.    October 24, 2006

On October 24, 2006, Plaintiff arrived at school: (1) wearing a pro-life sweatshirt that read, "Pray to End Abortion;" (2) red tape over his mouth; and (3) red tape on his wrists.  On the left wrist, the tape read "Jesus" and on the right wrist it read, "John 10:27" - "My sheep listen to my voice, I know them, and they follow me."  Plaintiff testified that he intended to remain silent in observance of this pro-life day of national solidarity and intended to pass out literature containing abortion facts, which he indeed did.  Plaintiff says that he handed out several leaflets to his classmates in the hallway.[1] Then, in his first hour English class, Plaintiff was sent to the principal's office by his teacher, Mr. Boudrie.  Plaintiff says Mr. Boudrie told him that his message was not "age-appropriate," it was "disruptive," and it was not suitable to express a pro-life message.

At the principal's office, Plaintiff met with Defendant Werner.  Werner called the Superintendent, Defendant Fitzpatrick.  After that conversation, Werner ordered Plaintiff to remove the tape from his mouth and wrists, and to turn his sweatshirt inside-out, or put another shirt over it so that the message could not be seen.  Plaintiff followed these instructions.  Later, however, Plaintiff arrived in the lunch room.  He testified that he had band class after lunch and, therefore needed to carry his instrument and notebooks. Plaintiff wanted to put his notebook and binder in his sweatshirt pocket so that it would be easier to carry his instrument.  In order to do this, Plaintiff planned to turn his

---

[1]Plaintiff testified that he believes he handed out approximately 10 leaflets.

4

sweatshirt right side-out and cover the pro-life message with a piece of paper. While attempting to do this, Defendant Werner saw Plaintiff and instructed him to turn his sweatshirt inside-out. When Plaintiff told her his intention was to cover the message, she sent him to the principal's office again.

This time Plaintiff met with Principal Kinsland. Plaintiff testified that Kinsland made several statements regarding his activities: (1) that plaintiff could protest at home but not on school property; (2) that his message was not "age appropriate"; (3) that he, Kinsland, was not allowed to smoke, drink, or look things up on the internet while at school, and that Plaintiff could not do whatever he wanted either; and (4) that Plaintiff could not engage in such expression because of separation of church and state. Defendant Kinsland confirmed that he made these statements to Plaintiff.

Notably, Defendant Kinsland further testified that the only "disruption" caused by Plaintiff's activities was that other students saw Plaintiff turn his sweatshirt right side-out in the cafeteria.

### B.    The Distribution Policy

The Distribution Policy was approved by the Jefferson County School Board. Although it purports to set forth students' rights concerning the distribution of literature and publications, and the procedure they are to follow to gain permission to distribute literature on school premises, the testimony was that the Policy, itself, has never been distributed to the students. JSD Principal Kinsland testified that at the beginning of each school year he reads any amendments to the Policy to students at an assembly. However, to demonstrate that Plaintiff was, nonetheless, on notice concerning the requirements of the Distribution Policy, Kinsland testified that before October 24, 2006,

5

Plaintiff sought to distribute literature for a bible club he wanted to start at the school.

Kinsland told Plaintiff that he could not distribute the literature; he had to post it.  Plaintiff

testified that he was not aware of the Policy or of all of its requirements.  On October 24,

2006, when he was sent to the office, the only reason he was given for why he could no

longer leaflet was because he had not obtained "prior approval;" but, the steps to get

such approval were not outlined to him.

### C.    The Literature

On January 31, 2007, Plaintiff wishes to distribute the same piece of literature he

had moderate success distributing on October 24, 2006.  The front side of the leaflet

displays a drawing of a toddler's face, and reads:

She's A Child Not A Choice
Why I AM Silent

Every day in the United States of America over 4,000 American citizens are silenced against their wills.  They have their voices permanently silenced and they never get the opportunity to speak on behalf of themselves.  Today we stand in silent solidarity with those who have been silenced.  Today we are silent, but by doing this we are being a voice for the one-third of our generation that will never have a voice.

These victims are not only being silenced; they are being killed.  The victims we stand on behalf of are not going to be mentioned on the news.  The victims we stand on behalf of will not have a funeral.  The victims we stand on behalf of were ripped from the safety and warmth of their mother's womb.  The victims we stand on behalf of were not blobs of tissue, but beautiful human persons, with hearts that beat, brains that gave out brain waves, and a soul.  These are victims of the abortion holocaust.

Everyday over 4,000 babies have their lives ended in the name of choice.  Since January 22, 1973, over 46 million babies have died.  The time is now to stand on behalf of these innocent victims.  Visit www.standtrue.com to find out how to be a voice.

The back side of the leaflet reads:

A few development Facts

20 days: Foundation of brain, spinal cord and nervous system are laid.

6

24 days: Heart begins to beat.

30 days: Child has grown 10,000 times to 6-7 mm (1/4") long.  Brain has human proportions.  Blood flows in veins (but stays separate from mother's blood).

35 days: Pituitary gland in brain is forming.  Mouth, ears and nose are taking shape.

42 days: Skeleton is formed.  Brain coordinates movement of muscles and organs.  Reflex responses have begun.  Penis is forming in boys.  (Mother misses second period.)

43 days: Brain waves can be recorded
8 ½ weeks: Fingerprints are being engraved.  Eyelids and palms of hands are sensitive to touch.

9 weeks: Child will bend fingers around an object placed in the palm.  Thumb sucking occurs.  Fingernails are now forming.

10 weeks: Body is sensitive to touch.  Child squints, swallows, puckers up brow and frowns.

11 weeks: Baby urinates, make complex facial expressions - even smiles.

12 weeks: Vigorous activity shows distinct individuality.  Child can kick, turn feet, curl and fan toes, make a fist, move thumbs, bend wrists, turn head, open mouth and press lips tightly together.  Breathing is practiced.

13 weeks: Face is prettier, facial expressions resembling parents'.  Movements are graceful, reflexes vigorous.  Vocal chords are formed (but without air baby cannot cry).  Sex organs are apparent.

4 months: Child can grasp with hands, swim and turn somersaults.

5 months: Sleeping habits appear, but a slammed door will provoke activity.  Child responds to sounds in frequencies too high or low for adults to hear.

6 months: Fine hair grows on eye brows & head.  Eye-lash fringe appears.  Weight is about 640g (22 oz.), height 23 cm (9").  Babies born at this age have survived.

7 months: Eye teeth are present.  Eyelids open and close, eyes look around.  Hands grip strongly.  Mother's voice is heard and recognized.

For more life development facts go to www.standtrue.com.

## II.    ANALYSIS

To issue a preliminary injunction, the Court must determine: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the injunction would serve the public interest.  *Jones v. City of Monroe*, 342 F.3d 474, 476 (6th Cir. 2003).

### A.    Application of Standard to This Case

#### i.    *Likelihood of Success on the Merits.*

The Supreme Court has held that "the loss of First Amendment Rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 42 U.S. 347, 373 (1976); *see also Barber v. Dearborn Pub. Sch.*, 286 F.Supp.2d 847, 858 (E.D.Mich. 2003)(stating that when school officials exceed their authority and unconstitutionally violate student's free speech rights, they cause irreparable harm). Because the loss of First Amendment rights is, in and of itself "irreparable injury," the Court must analyze and determine the likelihood of Plaintiff's success on his First Amendment argument.  At the heart of this determination is Defendants' Distribution Policy.

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and those rights extend beyond the classroom -- "when he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinion, even on controversial subjects . . .." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507; 512-13 (1969). Therefore, in order for the Distribution Policy to pass constitutional muster, it must not

8

be overbroad.  *See Riseman v. Sch. Comm.of Quincy*, 439 F.2d 148, 149-50 (1st Cir.

1971); *Fujishima v. Bd. Of Educ.*, 460 F.2d 1355, 1359 (7th Cir. 1972); *Baughman v.*

*Freienmuth*, 478 F.2d 1345, 1350-51 (4th Cir. 1973).

The Defendants' Distribution Policy applies in the case of "any distribution" of

literature on school premises. . ."  The Policy defines "Literature" as including, but not

limited to, "newspapers, magazines, leaflets, and pamphlets."  "Distribution" is defined

as "giving out or division among a number of persons, sharing or parceling out, allotting,

dispensing, apportioning, either by physically doing so or placing the material to be

distributed in any public area so that another person may obtain the same either for a

[sic] free or without charge."  This language requires the Court to determine whether the

Distribution Policy is facially unconstitutional because it suppresses and restrains

expression protected by the First Amendment.

The Policy suppresses more speech than necessary for JMS to satisfy its

societal interest in teaching, and its obligation to balance that interest against

fundamental First Amendment rights of students which the State must respect.  The

Distribution Policy pertains to all types of literature.  Arguably, if a student brought a

magazine to school--the content of which was music, wrestling, cars, jokes – and

wanted to give ten copies to friends, this Distribution Policy would require that the

student submit those magazines to the principal before he/she distributes them to

friends.  And, the principal would be able to designate a time, place, and manner for

distribution.  While defendant Kinsland testified that he would not need to give prior

approval to distribution of a music magazine, for example, such testimony only

underscores Plaintiff's contention that Defendants sought to regulate him because of

9

the content of his literature, since Plaintiff was told he needed prior approval to distribute his anti-abortion literature.

"School officials do not possess absolute authority over their students." *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503, 511 (1969). The Court finds that the Distribution Policy is overly broad and effectively chills the exchange of ideas. Public schools have consistently been recognized as a "market place of ideas." *Id.* "Personal intercommunication among students," can be counted as one of the specific purposes to which schools are dedicated. *Westfield High School L.I.F.E. Club*, 249 F.Supp.2d 98, 122 (D.Mass. 2003)(citing *Tinker*, 393 U.S. at 512). Hence, "the viligant protection of constitutional freedoms is nowhere more vital than in the community of American Schools." *Id.* at 123 (citing *Burch v. Barker*, 861 F.2d 1149, 1159 (9th Cir. 1988).

It is for these reasons that the Supreme Court held in *Tinker* that schools must tolerate student expression unless it "materially and substantially interferes with the requirements of appropriate discipline in the operation of the school or collide with the rights of others." *Id.* at 513 (citations omitted).

In considering the constitutionality of Defendants Policy, Plaintiff urges the Court to apply *Tinker*'s "material and substantial" disruption standard. Plaintiff asserts that there is no evidence that his leafletting in school hallways did cause or is likely to cause a material disruption.

To the contrary, Defendants' argue that *Tinker* is inapplicable. Defendants' argument is sharply focused on their school as a nonpublic forum where speech can be regulated as to time, place, and manner.

A "nonpublic forum" consists of "public property which is not by tradition or

10

designation a forum for public communication." *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983). Government imposed content neutral time, place, or manner restrictions in such locations are valid, so long as the "regulation on speech is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." *Id.* The Court agrees that JMS is such a location.

Citing *United States v. Hazelwood*, 484 U.S. 260 (1980) and several Circuit court decisions, Defendants further assert that the school's "nonpublic forum" status gives Defendants the authority to impose reasonable restrictions on Plaintiff's speech to maintain order in the school. *See Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996)(holding that prohibiting hand billing in the hallway between classes is a reasonable time, place, and manner restriction because schools are non-public forums).

In response, Plaintiff acknowledges that schools may impose reasonable restrictions on conduct. However, he contends that the leafleting, in and of itself, is pure speech - not conduct - and should be analyzed as such. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640 (1981); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); *Lovell v. City of Griffin*, 303 U.S. 444 (1938).

The Supreme Court carved out three categories to justifiably regulate student speech in schools: (1) school-sponsored speech under *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); (2) vulgar, lewd, obscene and plainly offensive speech under *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986); and (3) speech that falls into neither category, but causes a material disruption, is reasonably likely to do so, or interferes with other students' rights as provided in *Tinker v. Des Moines Indep. Cmty.*

11

*Sch. Dist.*, 393 U.S. 503 (1969).[2]

Essentially, these three categories are an attempt to balance students' right to free expression and the ability of schools to carry out their educational mission while refraining from endorsing particular viewpoints.

The Court finds that this case is controlled by the standard set forth in *Tinker*. In *Tinker*, three students were suspended for wearing black armbands protesting the Vietnam War. 393 U.S. at 504. A group of adults and parents publicized their objections to the war and support of a truce by wearing black armbands during the holiday season. *Id.* In response, school officials met and adopted a specific policy that any student wearing an armband would be asked to remove it. *Id.* at 506. If the student

---

[2]In *Fraser*, the Supreme Court held that a school district acted within its authority to discipline a student who gave an offensive, lewd, and indecent speech at a school assembly. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986). In delivering a speech to nominate a fellow student for an elective office, the student made several references to the nominee's genitals. *Id.* at 687. The Court distinguished the student's "sexually explicit monologue" from the political message of the armbands in *Tinker*. *Id.* Finding that the former type of conduct has historically been curtailed, the Court concluded that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 681-83.

Almost two years later, the Court held that school officials possess greater authority to limit speech which is or appears to be school-sponsored. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). *Kuhlmeier* involved a high school principal's decision to remove two pages from a student newspaper published in connection with a journalism class. *Id.* at 270. The two pages contained articles which the principal deemed inappropriate for a school newspaper because one described three student's experience with pregnancy and the other discussed the impact of divorce on students at the school. *Id.* The Court held that the principal's actions did not violate the students First Amendment rights because the newspaper was not a "public forum." The Court reiterated that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Id.* at 265.

refused, the student would be suspended until the student returned without the armband. *Id.*

The *Tinker* Court concluded that even though there was no disorder or disturbance of the educational process, school officials punished the students for expression, for speech. The Court stated that school officials must have "more than a mere desire to avoid discomfort and unpleasantness that always accompany an unpopular viewpoint" in order to justify limitation of student expression. *Id.* at 509. Students, the Court further emphasized, are "persons" under the Constitution in school as well as out of school, and they possess fundamental rights which the state must respect. *Id.* at 511.

It is left to the Court to determine if there is an objective basis for the school's forecast of disruption. Applying *Tinker* to this case, there is no evidence that a material and substantial disruption occurred on October 24, 2006 or is likely to occur on January 31, 2007, when Plaintiff again wishes to protest. Although Defendants argue that they are concerned that Plaintiff's leafleting may cause litter or crowds in the hallway, *Tinker* warns that school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome a student's right to freedom of expression. *Tinker*, 393 U.S. at 509.

At best, Defendants only point to other students who witnessed Plaintiff's reprimand as a disruption. However, many students are likely to focus on a public reprimand of a fellow student regardless of what prompts it.

It follows that Plaintiff innocuously leafleting – not accompanied by oral speech -- is less likely to cause crowding or a disruption in the hallways than if he were to

13

verbally proclaim the same message, which Defendants concede he would be allowed to under the Distribution Policy and the Constitution.  As Justice Blackmun noted in *Heffron*, "[t]he distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time . . .."  *United States v. Kokinda*, 497 U.S. 720, 735 (1990)(citing *Heffron*, 425 U.S. at 665)(citations omitted).  In distinguishing leafleting from solicitation, the Court describes leafleting as inherently less intrusive.  "One need not ponder the contents of a leaflet or pamphlet in order to take it out of someone's hand . . .."  *Id.*  Likewise, this Court agrees that Plaintiff's leafleting in the school hallways is unintrusive and unlikely to cause a material and substantial disruption.

If the Distribution Policy is unconstitutionally overbroad, Defendant has no basis upon which to require Plaintiff to submit his literature for a 3-day pre-approval review or delegate his speech to a designated area.  At first glance, restricting Plaintiff to a table in the cafeteria seems reasonable.  However, given the circumstances of Plaintiff's planned protest – he intends to remain silent the entire day, even while leafleting – placing him at a table in the cafeteria during the lunch hour significantly curtails his ability to reach an audience.  Moreover, Plaintiff is forced to passively wait for a recipient who is willing to approach to receive Plaintiff's message.  While this restriction might pass muster under a "reasonable" nonpublic forum standard, it does not pass constitutional muster under *Tinker*.  "Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots."  *Tinker*, 393 U.S. at 513.

If the Court applies *Tinker* and rejects the nonpublic forum analysis, Defendants

argue the result would be that (1) Plaintiff would have more rights than non-students and (2) First Amendment jurisprudence would be turned on its head.

Defendants' argument is unavailing.  It is the key role of the judiciary to protect student speech and to guard against suppression and restriction on speech simply because it makes school officials uncomfortable.  While this Court recognizes that school officials are entitled to deference, school authority must not be deferred to for the simple sake of authority.

By following *Tinker*, this Court does not intend to eliminate JMS's ability to maintain order and discipline.  *Tinker* did not give students an absolute right to speech, but its clear mandate is that it is unconstitutional to defer to school officials in the absence of proof of a substantial disruption.  To do otherwise would be to follow Justice Black's dissenting view in *Tinker*, not the majority.

Defendants argue that since *Tinker*, several lower courts decided to take Justice Black's approach, and have distinguished *Tinker* as only applying to content-based restrictions in the absence of proof of a substantial disruption.  These courts have upheld time, place, and manner restrictions on student speech.  *See Nelson v. Moline Sch. Dist. No. 40*, 725 F.Supp. 965 (C.D.Ill. 1989); *Bystrom v. Fridley High School, Indep. Sch. Dist. No. 14*, 822 F.2d 747, 754 (8th Cir. 1987)(upholding policy requiring review and approval by principal prior to circulation of all material distributed on school grounds); *Clark v. Bd. of Ed.*, No. 87-0244,1987 U.S. Dist. LEXIS 15305, at *24-25 (W.D. Mo. October 9, 1987)(upholding policy requiring written prior approval to distribute non-school materials).

However, other lower courts continue to rely on *Tinker* to protect student speech

15

where there is no evidence of disruption of school activities.  *See Burch v. Barker*, 861

F.2d 1149 (9th Cir. 1998)(declaring unconstitutional a school policy require prior

approval of all material distributed at school events); *Raker v. Frederick Co. Pub. Sch.*,

No. 5:06-CV-00122, 2007 U.S. Dist. LEXIS 3957, at *13-17(W.D.Va. January 19,

2007)(preliminarily enjoining the defendant from prohibiting the plaintiff from engaging in

activities related to the Pro-Life Day of Solidarity and holding that the defendant's time,

place, and manner regulation was not supported by a finding of disruption sufficient to

satisfy the *Tinker* standard).

Even assuming, *arguendo,* that forum analysis is the proper way to address the

First Amendment questions raised here, Defendants' Policy still fails because its

restriction on the possession and distribution of "literature" is unreasonable and

overbroad.

Narrowing *Tinker* to the limited circumstance argued by Defendants eviscerates

its essential holding and significantly harms First Amendment jurisprudence.  Because

Defendants cannot point to any past or potential disruption, the Court finds that it is

likely the restrictions Defendants seek to impose on Plaintiff are unconstitutional.  Given

the importance of the exchange of ideas in public schools and the likely chilling effect on

speech, the Court concludes that Plaintiff demonstrated a strong likelihood of success

on the merits.

### ii.    Irreparable Injury

As stated above, the Supreme Court explained in *Elrod v. Burns*, that "[t]he loss

of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury."  *Elrod*, 427 U.S. at 373.  The likelihood of success on the

merits will usually be the determinative factor on whether to issue a preliminary injunction in a First Amendment case. *Connection Distrib. Co. v. Reno*, 154 F.3d 28, 288 (6th Cir. 1988). Since Plaintiff has demonstrated a strong likelihood of success on the merits of his First Amendment claim, the Court finds that Plaintiff will suffer irreparable injury if the preliminary injunction is not issued.

    *iii.    Substantial Harm to Others and Public Interest*

    The harm to other parties will be minimal if Plaintiff is allowed to distribute his leaflets in the hallways. Defendants also will not suffer any harm if they are enjoined from enforcing an unconstitutional policy. *See United States v. Newsome*, 354 F.3d 249, 261 (4th Cir. 2003). Likewise, the final prerequisite for a preliminary injunction - that it serve the public interest - weighs in Plaintiff's favor. Protection of constitutional rights, and particularly First Amendment rights, is always in the public interest. *See Barber*, 286 F.Supp.2d at 860 (stating that "it cannot be said that the status quo benefits the public."). "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Tinker*, 393 U.S. at 512.

**III.    CONCLUSION**

    For the reasons set forth above, Plaintiff's Motion for a Preliminary Injunction is **GRANTED.**

    **IT IS SO ORDERED.**

17

_____/s/ Victoria A.  Roberts_____
**Victoria A.  Roberts**
**United States District Judge**

**Dated:  January 30, 2007**

> **The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or fax on January 30, 2007.**
>
> **s/Linda Vertriest_____**
> **Deputy Clerk**

18